All right, our next case for this morning is Sommerfield v. Lawrence Knasiak. We'll hear from Mr. Schuman when you're ready. Thank you, Your Honor. May it please the court, counsel, I'm Anthony Schuman. I'm here on behalf of Appellant Lawrence Knasiak. The district court erred in denying Lawrence Knasiak's judgment as a matter of law or a new trial based on the jury's verdict in favor of Sommerfield's discrimination claims. The district court further erred in refusing Knasiak's request for a reduction of the $540,000 punitive damages award. For the reasons set forth in Knasiak's brief, he respectfully requests that the court reverse the district court and enter judgment as a matter of law in favor of Knasiak or a new trial, and additionally to reduce the punitive damages award. It is undisputed that Knasiak, the only person with any alleged discriminatory animus towards Sommerfield, did not make the decision to suspend Sommerfield and did not make the decision to deny him the canine handler position, which were the adverse actions. But this, of course, is a trial. Wasn't there quite a bit of evidence that his recommendations for these suspensions were always followed, like 20 out of 20 instances? I mean, it's a lot like a situation, you know, maybe you file a lien on someone's property. You can put a procedural barrier in someone's way that is going to have further implications, and a jury could have thought that's what Knasiak did. But if the jury thought that, Your Honor, that was a misapprehension. Well, there's evidence, though, as I'm saying. I mean, there's evidence in the record that his recommendations about suspension decisions were accepted. His recommendations concerning suspensions were accepted concerning SPARS, which was a different type of complaint than the complaint register. The SPARS were more, was a different type of disciplinary action. No, I understand they're two different kinds of things, but I believe there was evidence in this record that the jury could have said when he got the ball rolling on this other kind of suspension, his recommendations were taken. But, Your Honor, the issue here is the discriminatory animus of Knasiak did not cause the adverse action because there was no evidence admitted that Knasiak ever communicated with the independent investigation that was conducted by the Chicago Police Department Internal Affairs Division. No, I understand that, too. I understand you're trying to put this into a cat's paw kind of a theory, which is the district court was very clear that's not what she thought was going on. But the theory of this case, however it stacks up, we'll see, is that Knasiak himself creates this impediment to Summerfield's further progress. As it happens, he wanted to be a dog handler. But Knasiak creates that by initiating this suspension process. He certainly initiated it. You would agree with that? I agree. Okay. And that in and of itself was enough of a shadow on Summerfield's record that he doesn't get the position. Well, the fact that Sergeant Knasiak initiated the complaint and made an allegation of insubordination, and even if that insubordination was based upon discriminatory animus and was not true, the adverse action was the chain in the adverse action in terms of problem caused foreseeability and the result that would occur was broken by the independent investigation. No, I understand that that's your theory, and I guess I'm not doing a good job of it, but saying that I believe his theory is that you didn't even need to get to the end of the investigation. You didn't need to have this complaint either upheld or not, that the mere process of the suspension was enough to keep him from getting the promotion. The suspension, I would agree, would be an adverse action. And the initiation of the complaint to issue some discipline. Right, and I think that's where we're talking about two different things. You think we need to get all the way out to the end of the result of the suspension, for which you argue that there was intervening cause, and the jury heard evidence that maybe there was an intervening cause. Once Konesiak said what he said, that was that, and this further investigation was just so much wheel spinning. Or there's another way of looking at it, that simply being under the shadow of this kind of investigation is enough to hurt you without the result, no matter how the result came out. But that was not the result, and that was not the theory of the case. And I think I understand what you're saying. The shadow, but the fact that he initiated the investigation or initiated the complaint, did not mean that the Internal Affairs Division or the Command Review Channel would have rendered an unfounded decision or an unsubstantiated decision. Mr. Shuman, what did you argue to the jury? What was your theory when you argued to the jury? Well, and I don't mean to move away. Our theory going into the case was that because of the separation and that Sergeant Konesiak did not directly render the decision to either suspend or to deny the promotion, the only basis for this case was a cat's paw theory. And we went into the case believing that the cat's paw theory would be the one that the plaintiff would use. If plaintiff can jump over a theory in which the Konesiak, who may have had animus, did not render the decision, then what's the purpose of the cat's paw theory? The cat's paw theory is presented when that situation exists. Now, how did the district judge blew hot and cold on that theory? As far as I can see from reading the record, is your view, did the district court ever accept the cat's paw theory? No. I don't know. The district court specifically said she didn't. It wasn't a point of her not accepting the cat's paw theory. It was, I believe, the point of the plaintiff did not assert the cat's paw theory, and the plaintiff wanted to proceed on a more direct theory of liability, which was proximate cause. Under approximate cause theory, there had to be foreseeability and a result. And in your view, that's what went to the jury? That's what went to the jury, foreseeability and approximate cause theory. And even if it did, and even if, as Justice Wood points out, that the initiation may have been a basis for the suspension, more importantly, certainly three years down the line when the denial of the promotion took place, there was no reasonable foreseeability that could have been invoked to the discriminatory animus of Canasiac that he would have reasonably foreseen that result, and he wouldn't have seen that result. Couldn't the jury have thought that was exactly the result he was aiming for? I mean, it was a pretty minor event that spurred that initial complaint. It was, and maybe the jury felt that that was what Canasiac was trying to do. And the jury does find the proximate cause. You said those were the instructions that were given. That's correct. There was an instruction on proximate cause. And I'm sure you argued that there was no proximate cause because of intervening events. You must have argued intervening cause to the jury. Yes, we did. But we also argued, because there's two adverse actions. We think that the adverse actions are separate. There's one adverse action, which was the five-day suspension, and then there's the other adverse action that occurred three years down the line for the denial of the promotion, in which there was no evidence that Canasiac knew that Summerfield had applied, knew that there was a departmental order that he couldn't have three suspensions. I thought there was evidence that it was very well known that Canasiac, sorry, that Summerfield wanted this promotion and that he was in line for it and had been training and doing all the things. You don't just sort of walk in and say, hello, I'm a dog handler. You have to do a lot of training to get to that point. I don't think that there was. Respectfully, Your Honor, I don't believe that there was any evidence at any point that Canasiac knew that Canasiac had applied for the K-9 position. Even if Canasiac, I'm sorry. And this particular disciplinary action wouldn't give him his three strikes, right? He still needed another. He needed two others. He needed two others. He was his first strike. Actually, I think Canasiac's suspension fell in the middle. Okay. So there was no evidence. He still needed one more. Correct. And the one more occurred after Canasiac initiated his CR that resulted in that suspension. So if I could move on, Your Honor, I'd like to discuss a little bit, and then I can come back to it in rebuttal, the punitive damages argument. But actually, Your Honor, looking at the time that I have, and I've split it 10 and 10, I would like to defer to my rebuttal. It's your choice. You said 10, so that's fine. Thank you, Your Honor. Wait. Mr. Longo. May it please Your Honors and Counsel, what I thought I would do is just mention five points from the defendant's reply brief and then touch upon Your Honor's questions and then finally make an attempt to answer any questions Your Honors may have. On page six, Canasiac talks about our retaliatory claim, and we state in our brief that even if Your Honors will affirm on any basis, and Canasiac, even in his oral argument, by the way, doesn't refer to retaliation. He doesn't discuss retaliation in his brief. He discusses just the discrimination claim. So we argued that on that basis alone, he's waived the argument on retaliation. Therefore, Your Honors can affirm the $54,000 of equitable damages based upon the retaliation claim. On page six of the defendant's brief, the defendant says, No, that's not so because Judge Gottschall barred the plaintiff from receiving additional compensatory damages. With all due respect, that's misleading. Judge Gottschall did bar compensatory damages, but compensatory damages are pain and suffering. She never, that I'm aware of, ever barred any equitable damages such as back wages. Indeed, section 1981 specifically excludes from the definition of compensatory damages back wages interest. So that's point number one. Point number two on page 18, Canasiac admits that he's not seeking a refund of the $54,000 of equitable damages. Well, then this bolsters the plaintiff's position that he essentially concedes liability. And it bolsters the plaintiff's position of mootness. Then what is it that he wants from Your Honors? He doesn't want a refund. Well, this case is a little strange in that we have, you know, Summerfield 1, and now here we are in Summerfield 2. It's unusual that it would be split up like this. I know there are different defendants. I'm not saying there's a preclusion problem per se, but it makes it, obviously he can't recover twice. So if the city of Chicago has already paid him for certain damages, they were damages, but he's been paid. So Judge Goschel reasonably would have said you can't come back here and ask for them again. Of course, and they were paid as a result of this lawsuit before Your Honors. Because Mr. Summerfield got exactly the amount related to the jury's verdict, approximately $54,000. Point number three, on pages 1, 10, and 17 of the reply brief, Kinesiak discusses settlement. There's no settlement. Where are the facts for settlement? Where is the evidence for the settlement? So can I actually jump ahead from your own schedule here? I would like you to talk about Mr. Schuman's intervening cause argument because we can all see what Kinesiak did. We can all see that it culminates in this suspension and that there's the three suspension rule and that he doesn't get the canine handler position. But he argues that the investigation function and the people who eventually suspend are really just too far removed from Kinesiak to attribute all of the bad things that happened to him to Kinesiak. Well, I'll respond to it, shall we say, factually and legally. Let's start with the legally. If I remember correctly from Stubb, the Supreme Court stated that an argument can be made that the decision maker's judgment was an intervening cause because he based his decision on his own independent investigation. And if I remember correctly, the Supreme Court said, no, that's not so. You don't break the chain of proximate cause just because the ultimate decision maker makes an independent investigation. Factually- Is that because there's bad data? I mean, again- Because the decision maker relied on the data presented by the discriminatory supervisor. We sometimes have gotten carried away with metaphors, and I'm afraid that the cat's paw theory is one of those instances of- In one of your decisions you state that. You get carried away. Well, because it's a bit more of my- I think it's the little decision. But what we need, though, if the jury was asked, is there proximate cause, were Kinesiak's actions sufficiently related to, first, the suspension, and then, of course, Kinesiak would have known as a member of the police department that a suspension has all sorts of negative effects on somebody's prospects. Especially for insubordination. Of course, for insubordination. Probably anything that rises to the level of this kind of action is supposed to be serious. So are we to take that to mean that the jury simply said these intervening steps were, in fact, not enough to break the chain from Kinesiak's actions to the negative impact on Mr. Summerfield? Yes, because that's how the jury was instructed. And did anybody object to those instructions? No. Okay. No. And also I might add that the jury, we could infer the jury could reasonably be suspicious of this alleged break of Kinesiak's involvement. For example, counsel said that there's no evidence that after, essentially he stated, after Kinesiak submitted his C.I. he was involved in the investigation. That's not, that's false. There is record evidence from the sergeant, the investigating sergeant of I.A.D. who admitted that after Kinesiak filed his C.R. he contacted this investigating sergeant in I.A.D. and furthermore that Kinesiak communicated with another sergeant at I.A.D. about his C.R. So the jury could be suspicious about that. So we don't really have any break. So the jury could, I guess you're saying the jury could take those pieces of evidence as an indicator that there wasn't the kind of clean break that you would look for from an intervening cause. Exactly. And furthermore, in the command channel review of the three or four people, two of them are Kinesiak's supervisors whom he had a wonderful relationship with, his commander and his area chief. As Your Honor pointed out, 20 times Kinesiak recommended suspension, 20 times his recommendation was rubber stamped. So we don't really have any break in proximate cause. And counsel's reference to, you know, three years later, well, what happened three years later? Mr. Summerfield had a clean record, not even a reprimand. All of a sudden in 2006 he gets three suspensions, three of them. And the timing is interesting, and the jury may have thought it was interesting. It was shortly before that Summerfield was supposed to be promoted in January of 2007. So did Kinesiak have a hand in this? I don't know. But for counsel to say that this happened three years later, he couldn't foresee it, well, the jury might have thought otherwise. Did you argue that? Yes, I'm sure. I would imagine that I did. I'm pretty sure I did. And, you know, Kinesiak had a hand with his commander. He had a lot of influence. We mentioned from the record that he wasn't supposed to get a shift change because he didn't have that type of seniority even though he had been there, what, 15, 20 years. But because of his relationship with the commander, he was able to get a shift change over other sergeants, and he served, as Kinesiak admitted, at the commander's pleasure. So he had a lot of influence. And it showed by the way he treated this Jew, German, whom he believed should have been shot in the head or his flesh should have burned. Did the investigating sergeant have the duty of simply finding the facts or did the investigating sergeant have the responsibility of recommending at his position? He had the—I don't know if it was his responsibility, but it might have been. But he did recommend the suspension. Is that in the record? It is. It is. In paper form or did he testify? He testified to it, and I believe it's also in writing. I believe it was part of his report that he accepted that recommendation of suspension. He accepted the—no, the investigating officer. He recommended the suspension, and this is, of course, after he spoke to Kinesiak. We don't know what was—was he ever asked what was said in that conversation? I don't want to represent something that I'm not exactly certain. Everybody's a pal of everybody else, but when it comes to hard testimony, things seem to be lacking. I would imagine I would have asked that in his deposition, which would have been like, you know, 10 years ago. But I cannot tell you. I don't want to represent something I'm not certain about. Another point from the reply brief is that Judge Gottschall noted that one of the factors that need to be considered for punitive damages is that Kinesiak launched an extremely aggressive defense. And I think this is important for several reasons. Number one, it implies that—and Kinesiak states on page—Kinesiak states he's not responsible for it. Well, then by stating that, he's implying that somebody is responsible, and that is the city. Well, I guess I want to be careful there because, of course, people are entitled to defend themselves against this kind of extraordinarily serious allegation of what the underlying behavior was and what the consequences were and so on. We do have tools, such as 1927, such as the court's inherent power, such as Discovery Center. There are a whole array of tools. If somebody is behaving in an abusive manner in the litigation process, that's what you're supposed to turn to. I loathe to say that punitive damages are the consequence of an aggressive defense. Are you narrowing that at all? That's too broad a statement for my taste. And really, the punitive damages, as Your Honor's cases have pointed out, are focused on the wrong. Well, that's right. I mean, if punitive damages are justifiable, they're justifiable because the underlying behavior was sufficiently reprehensible that the jury should be entitled to make that decision, and then within the limits spelled out in cases such as BMW, the jury made an award. And I know that we saw in the briefs different kind of denominators that you might use. And from my own sense of things, one does need to look at Somerfield I and Somerfield II together on that because this case doesn't stand by itself. So I don't think this is a – well, I guess I came up with a punitive damages multiplier anywhere from 5.8 to 8.5 or so once you looked at everything. Even that's a lot. You know, this is a big award against a person like Knesiak. And it's also a lot to – this is one of the world's largest police departments, a sergeant who's supposed to uphold the law, who flagrantly, arrogantly is threatening somebody day in and day out for years. Burn, Jew, burn. I mean, Hitler should have killed all of you Jews. Let's burn you and put you in the ashtray along with 1,000 other Jews. How would one come to work each day? How would one survive each day? And punitive damages are, quite frankly, $540,000 is too low. It's too low to send out a message to – considering that there were sergeants and captains and lieutenants next to Sergeant Knesiak day in and day out condoning this, $540,000 is too low to send out a message to this department, this Chicago Police Department, and nationally to law enforcement. On page 3 of Knesiak's reply, Knesiak states, quotes, Knesiak's discrimination played no part, close quotes, in the suspension. Knesiak appears to admit that he discriminated against Sergeant Knesiak. Well, I mean, we can assume he means alleged, but I would assume as well that your response would be the jury found otherwise. I mean, if it's a jury question, then we defer to the jury. Yes, and the jury heard a lot of evidence for a week and a half, and they assessed these witnesses live. Can you say a little more about the other suspensions? You said they were all in 2006. Exactly. Exactly. What were they for? One of them was for another Sergeant Majewski, it's in the record, said that it was for a minor infraction, something about not completely filling out a preliminary report. He said it was a minor. He admitted it. And yet, Summerfield is getting suspended, and when did all these suspensions happen? And was there evidence that other people were not getting these suspensions for the similar behavior? Knesiak admitted that never had he issued a CR for insubordination against any officer, so the answer is yes. Okay, so just way out of the ordinary. Just Mr. Summerfield. And as Your Honor pointed out, this is a minor infraction. I mean, a gas card incident. Oh, getting a gas card, yeah, right. And yet Knesiak pulled in, set in motion, pulled in, you know, sergeants and lieutenants and captains into the commander's office, pulled them off the street where they should have been upholding the law and deterring crime, pulled them into the commander's office to act as witnesses. It had never been done before. Knesiak admitted that. The other sergeants admitted that. And to boot, it was a minor incident. So why? The jury could be suspicious about that. That Knesiak set in motion a CR to guarantee that Knesiak to Summerfield would be suspended. And everybody knew that Summerfield was up for promotion. As Your Honor pointed out, he went through rigorous training. He talked about it. Sergeant Woods talked about it regularly, that Mr. Summerfield talked about his promotion. He couldn't wait for it. Sergeants talked about it. They knew he was on the list. They're his supervisors. So for Knesiak to argue that there's nothing in the record. So you would just say because this was so widely known, a jury could infer that it had come to Knesiak's attention as well. Exactly, because he was Mr. Summerfield's supervisor. And Sergeant Woods admitted that. All the sergeants knew that Mr. Summerfield was on the well-qualified list. And they would have to know because if one of their employees is going to be transferred, then they're going to have to get somebody else. So it was no secret. So it certainly is in the record. I could entertain Your Honor's questions. Ken, any more questions? I see no other questions, so you can sit down or sum up as you wish. I would sum up that Your Honors have repeatedly deferred and respected the jury's verdict. The jury worked hard in this case. We all did. This is a 12-year-old case. The evidence is there that Knesiak discriminated against Mr. Summerfield. He wanted to set him up for the suspension. He got the suspension. And he wanted to destroy Mr. Summerfield's chance to be promoted to a K-9 handler. Why? Because Mr. Summerfield repeatedly talked about his joy of making the list, the well-qualified list, and could not wait to fulfill his dream to be a K-9 handler. Thank you, Your Honors. Thank you. Anything further, Mr. Schuman? And thank you for allowing us to be here today. Yes, Your Honor. Thank you. I do have something further. In concerning the Punitive Damages Award, first of all, in looking at reprehensibility, there's no question that in terms of the verbal harassment, Knesiak's statements, jokes, was reprehensible. Well, they were extremely reprehensible. This wasn't just my argument. And I would agree. But the only question I have about reprehensibility was, did the judge factor in the degree of reprehensibility other than it was just that punitive damages were appropriate? Surely she did. She knew what they – I mean, this course of conduct was. But as it related to the amount of the award. Did she affirm? But did it relate to – how did it relate to the amount of? Was the amount excessive? Right. But don't we have to assume that the jury found, A, that the statements were made, and, B, that the nature of the statements was, as we've been listening to this morning and as the record shows, I mean, just extraordinarily out of line. But – and also I just want to address the retaliation. The retaliation could not be part of the economic damages that were found. And, one, the economic damages were based on the grievances that the city paid as opposed to the civil rights action that was brought. But, you know, if the theory is different, if the underlying injury is the same, you still can't get two recoveries for the same underlying injury. Correct. So, I mean, it looked to me – I mean, yes, there was a grievance process and there were other things, but that sounds more like a difference in theory. I believe that's a damages – you know, that's a theory of damages, and we're not asking for the damages that the city paid. No, I just think – at least maybe – I read this. It was relevant to see what the amounts of those damages were when we turned to the question of assessing the amount of the punitive damages and what kind of multiplier was used and how much the jury assessed. But turning back to the punitive damages and reviewing the punitive damages in relation to the evidence, the extreme amount of the punitive damages award as compared to the actual damages inflicted on – can be evidence of bias and prejudice. And the plaintiff should not receive a windfall, and if it's merely a windfall, it may be reversed. But why is it a windfall? I mean, if we look to – you know, the district court says extremely reprehensible conduct, abuse of a position of power, goes on for years, escalated in tone and frequency, so she makes those findings. Then she looks at the $63,019 Chicago pays, and you could also look at the $30,000 from Summerfield 1, and you get a ratio below 6, which is single digit. The Supreme Court has – I mean, the court, quite understandably, has never said this is the ratio for all cases and all times, but they've indicated single digit ratios or maybe the double digit ratios are bound to be quite difficult to support single digit ratios easier. But looking at those ratios, and we argue that the court could look at, in terms of comparable penalties, Title VII punitive damages. But the problem with Title VII is that Congress has chosen to cap it. So instead of having – you know, if you think of it on a graph, a chart that just shows all cases with the most egregious cases bringing the highest levels, it gets lopped off at the $300,000 level. So that's a policy judgment Congress made, fine, but they did not make that policy judgment for these statutes. They didn't make the – So everything caps out at $300,000. You can't draw any inference above that. But when looking at Kanaziak's financial condition and the fact that he's personally liable for this excessive amount of punitive damages – Well, I understand he is, but where in the law does it say that that's what we look at as opposed to the conduct? Well, I think we look at both. You look at the conduct as well as the excessiveness and the fact that he's personally liable. I think that in looking at – Can you cite cases where people had discounted punitive damages because they were persons of more modest means? Yes. I don't know. I mean, you want enough punitive damages to create the deterrent and the punitive – that's why they're called punitive damages. And so to take it on the other side, you know, if you're suing Boeing and, you know, you get a punitive damages award of $100,000, somebody's going to say they won't even notice it. You know, it's a rounding error for them. So that's not a good amount. You need to have more. But the less situations, I think, are much more infrequent, and especially if the multiplier is justifiable. But I think it should be justifiable in looking at the financial condition, which is even in the jury instruction of the defendant. And in here, the jury's – What standard of review are you urging us to apply? De novo for punitive damages. So you think we should just sit down and come up with a punitive number that we like? I think you should come up with a reasonable punitive number based, one, which is in the jury instruction in which I believe the law states, one factor, not all, but one factor is Sergeant Kanasiak's financial condition. I'm dubious. Once you figure out it's within constitutional boundaries, I'm very dubious that the law would say that we do not defer to the discretion of the judge who heard all the evidence and who has a much better sense of the facts. Our normal standard of review there would be deferential. Again, once you're past the constitutional limit, if it's 100 to 1 multiplier, we would say that's too much. But we don't have that. But in this case, Your Honor, the jury specifically stated it should be 10 years pension, 10 years of his entire income of this person and this person's family, 120 months of his income. In balancing what is punitive enough to deter Kanasiak, who is retired, and who is no longer employed and needs deterrence and could impose this conduct any further, this is an extremely large award to him and his family. I mean, this could ruin him. I mean, it not only impacts him, it impacts his family. It impacts his expectations for retirement. And I understand he should be punished. And we're not saying that punitive damages should be vacated. We're arguing that punitive damages should be reduced to an amount in line to what could still invoke punishment and deterrence to Sergeant Kanasiak, but still not ruining his and his family's life. Mr. Shuman, could I just ask you a question regarding the delay in this case? On July 24th of 2014, the judge comes up with her figure of $540,000 in punitive damages. I mean, the chance of the order. It isn't until May 12th of 2017 that the total amount is. What happened in all this time when you're dealing with economic damages? What's the delay in this case? What was happening, Your Honor, is that, one, the judge had to determine the economic damages. So in that, as far as that, there were calculations that needed to be made. Three years? Almost three? Well, and it wasn't just that. Well, what else? What needed to be done? Because I just don't understand the delay in getting here. The delay was, one, the determination of what the economic damages were going to be. Yeah, but how? And two, well. What took so long to do that? We were going back and forth, and there were other motions that were being filed, motions being filed also by plaintiff to add the city of Chicago in account of indemnity and also a motion filed by plaintiff regarding prejudgment interest, in which the judge first denied prejudgment interest, then reconsidered and decided that there would be prejudgment interest. So even after the economic damages was determined, there was time spent on determining what the amount of prejudgment interest would be. Seems like a long time to me. It was a long time. A lot of attorney's fees here. Does the city pay for those attorney's fees? That's being argued. The attorney's fees issue is now being argued in the district court. Thank you. Thank you, Your Honor. So you need to sum up, Mr. Schuman, because your time is up. Oh, thank you. Well, Your Honor, again, for the reasons that Sergeant Kanasiak sets forth in his brief, we request the court reverse the district court's memorandum of opinion with instructions to enter judgment as a matter of law or order a new trial, and in addition to reduce the putative damages award. I thank you for your time and attention. Thank you. Thanks to both counsel. We'll take the case under advisement.